Slip Op. 14-94

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NAN YA PLASTICS CORPORATION, LTD., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant. | Before: Leo M. Gordon, Judge <br><br> Court No. 11-00535 |

**OPINION**

[Remand results sustained.]

Dated: August 14, 2014

Peter J. Koenig, Squire Sanders (US) LLP, of Washington, DC, for Plaintiff Nan Ya Plastics Corporation, Ltd.

David F. D'Alessandris, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States. With him on the briefs were Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director. Of counsel on the briefs was George Kivork, U.S. Department of Commerce, Office of the Chief Counsel for Import Administration, of Washington, DC.

Jeffrey I. Kessler, David M. Horn, Patrick J. McLain, and Ronald I. Meltzer, Wilmer, Cutler, Pickering, Hale and Dorr LLP, of Washington, DC for Defendant-Intervenors Mitsubishi Polyester Film, Inc. and SKC, Inc.

Gordon, Judge: This action involves an administrative review conducted by the U.S. Department of Commerce ("Commerce") of the antidumping duty order covering polyethylene terephthalate film, sheet, and strip from Taiwan. See Polyethylene Terephthalate Film, Sheet, and Strip from Taiwan, 76 Fed. Reg. 76,941 (Dep't of Commerce Dec. 9, 2011) (final results admin. review) ("Final Results"); see also Issues and Decision Memorandum, A-583-837 (Dep't of Commerce Dec. 5, 2011), available at

Court No. 11-00535                                                                                                           Page 2

http://enforcement.trade.gov/frn/summary/taiwan/2011-31695-1.pdf (last visited this date) ("Decision Memorandum").  Before the court are the Final Results of Redetermination, ECF No. 66 ("Remand Results"), filed by Commerce pursuant to Nan Ya Plastics Corp. v. United States, 37 CIT ___, 906 F. Supp. 2d 1348 (2013) ("Nan Ya I").  The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),[1] and 28 U.S.C. § 1581(c) (2012).

Plaintiff Nan Ya Plastics Corporation, Ltd. ("Nan Ya") challenges Commerce's continued assignment of a total adverse facts available ("AFA") rate of 74.34%.  See Nan Ya Comments on Remand Results 1, ECF No. 84 ("Pl.'s Br.").  For the reasons set forth below, the court sustains the Remand Results.

**I. Standard of Review**

For administrative reviews of antidumping duty orders, the court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole.  Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006).  Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2014). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." Edward D. Re, Bernard J. Babb, and Susan M. Koplin, 8 West's Fed. Forms, National Courts § 13342 (2d ed. 2014).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984), governs judicial review of Commerce's interpretation of the antidumping statute. See United States v. Eurodif S.A., 555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

## II. Background

As a consequence of Nan Ya's failure to cooperate during the administrative review, Commerce preliminarily assigned Nan Ya a total AFA rate of 99.31%, which it derived from two of Nan Ya's transaction-specific margins from the prior administrative

Court No. 11-00535 Page 4

review.  See Polyethylene Terephthalate Film, Sheet, and Strip from Taiwan, 76 Fed. Reg. 47,540, 47,545 (Dep't of Commerce Aug. 5, 2011) (preliminary results); Decision Memorandum at 5.  Nan Ya argued in its administrative case brief that Commerce should have instead used information obtained during the current administrative review, specifically, the transaction-specific data of cooperating mandatory respondent Shinkong Materials Technology Co., Ltd. ("Shinkong").  Case Br. of Nan Ya Plastics Corporation, Ltd., 7 (Dep't of Commerce Oct. 4, 2011), PD 23.[2]  Commerce agreed and in the Final Results selected Shinkong's highest transaction-specific margin, 74.34%, as Nan Ya's total AFA rate.  Commerce reasoned "this rate is representative of Nan Ya's current business practice" because "the data from the most recent review in which Nan Ya participated show . . . numerous [transaction-specific] margins for Nan Ya far above 74.34 percent."  Assignment of the Adverse Facts Available Rate for Nan Ya Plastics Corporation, Ltd. (Nan Ya), 3 (Dep't of Commerce Dec. 5, 2011), CD 27 ("AFA Assignment Memorandum").

Nan Ya then commenced this action challenging the 74.34% total AFA rate as "an unlawful aberrant outlier" that did not reflect its "commercial reality albeit with some built in increase to induce compliance." Nan Ya I, 37 CIT at ___, 906 F. Supp. 2d at 1351; see Nan Ya Plastics Corporation Rule 56.2 Mot. for J. on the Agency R. 3, ECF No. 3 ("Pl.'s 56.2 Br.").  Among its contentions Nan Ya proffered what appeared to be several compelling statistical arguments in support of its position.  See Nan Ya I, 37 CIT at ___,

---

[2] "PD" refers to a document contained in the public administrative record.  "CD" refers to a document contained in the confidential record.

906 F. Supp. 2d at 1353-55. However, because Commerce changed Nan Ya's AFA rate between the preliminary and final results, Nan Ya's first opportunity to present these arguments was in its opening brief before the court. The court therefore remanded the action for Commerce to address Nan Ya's arguments in the first instance. Id. at ___, 906 F. Supp. 2d at 1354-55.

The court also remanded to Commerce for further explanation the issue of the applicability of corroboration. Id. Although Commerce appeared, consistent with its practice, to corroborate the selected rate with Nan Ya's own transaction-specific data from a prior review, see, e.g., PAM, S.p.A. v. United States, 582 F.3d 1336, 1340 (Fed. Cir. 2009); Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1339–40 (Fed. Cir. 2002); Fujian Lianfu Forestry Co. v. United States, 34 CIT ___, ___, 700 F. Supp. 2d 1361, 1363 (2010), Defendant claimed that Commerce technically was not required to do so under 19 U.S.C. § 1677e(c) because Commerce selected the AFA rate from data obtained during the current administrative review. Def.'s Resp. to Pl.'s R. 56.2 Mot. 11, ECF No. 48. This, in turn, raised an issue about the applicability of the de Cecco standard the courts use to evaluate the reasonableness of Commerce's total AFA rates, a standard that emanates from the statute's corroboration requirement. Nan Ya I, 37 CIT at ___, 906 F. Supp. 2d at 1355 (citing F.LLI de Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000) ("de Cecco")).

On remand, Commerce assigned the same total AFA rate of 74.34% to Nan Ya. Remand Results at 2. Commerce also elaborated that the need to corroborate under 19 U.S.C. § 1677e(c) only applies to "secondary information" and not "information

obtained in the course of the . . . review," like Shinkong's data.  Id. at 5.  Commerce noted that although the de Cecco standard does not apply, Commerce's selection of an AFA rate must nevertheless still be supported by substantial evidence.  Id. at 10-13.  Commerce also addressed and rejected each of Nan Ya's arguments contesting the reasonableness of the AFA rate.

In its comments on the Remand Results, Nan Ya again challenges Commerce's AFA selection as unreasonable (unsupported by substantial evidence).  Pl.'s Br. at 2-3.

### III. Discussion

In a total AFA scenario Commerce typically cannot calculate an antidumping rate for an uncooperative respondent because the information required for such a calculation (in this case the respondent's sales and cost information for the subject merchandise during the period of review) has not been provided.  As a substitute, Commerce relies on other sources of information (the petition, the final determination from the investigation, prior administrative reviews, or any other information placed on the record), 19 U.S.C. § 1677e(b), to select a proxy that should be a "reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to noncompliance."  de Cecco, 216 F.3d at 1032.

When selecting an appropriate total AFA proxy, "Commerce must balance the statutory objectives of finding an accurate dumping margin and inducing compliance."  Timken Co. v. United States, 354 F.3d 1334, 1345 (Fed. Cir. 2004).  The proxy's purpose "is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins."  de Cecco, 216 F.3d at 1032.  Although a higher

AFA rate creates a stronger incentive to cooperate, "Commerce may not select unreasonably high rates having no relationship to the respondent's actual dumping margin." Gallant Ocean (Thailand) Co. v. United States, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (citing de Cecco, 216 F.3d at 1032). Commerce must select a rate that has "some grounding in commercial reality." Id. at 1323-24.

As de Cecco explained, these requirements are logical outgrowths of the statute's corroboration requirement, see de Cecco, 216 F.3d at 1032, which mandates that Commerce, to the extent practicable, corroborate "secondary" information with independent sources reasonably at its disposal. 19 U.S.C. § 1677e(c). In practice "corroboration" involves confirming that secondary information has "probative value," 19 C.F.R. § 351.308(d) (2013), by examining its "reliability and relevance." Mittal Steel Galati S.A. v. United States, 31 CIT 730, 734, 491 F. Supp. 2d 1273, 1278 (2007) (citing Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, Singapore, and the United Kingdom, 70 Fed. Reg. 54,711, 54,712-13 (Dep't of Commerce Sept. 16, 2005) (final results admin. reviews)). More simply, to corroborate the selection of a total AFA rate, Commerce must, to the extent practicable, "demonstrate that the rate is reliable and relevant to the particular respondent" in light of the whole record before it. Yantai Xinke Steel Structure Co. v. United States, 36 CIT ___, ___, Slip Op. 12-95 at 27 (July 18, 2012) (emphasis added); PSC VSMPO-AVISMA Corp. v. United States, 35 CIT ___, ___, 755 F. Supp. 2d 1330, 1336-37 (2011) (citing Gallant Ocean, 602 F.3d at 1323-24); de Cecco, 216 F.3d at 1032.

**A. Secondary Information and Corroboration**

Section 1677e of the antidumping statute mandates that Commerce use the "facts otherwise available" to fill information gaps on the administrative record. 19 U.S.C. § 1677e(a). When the gap results from a party's non-cooperation, Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b). As noted above, to identify a suitable total AFA proxy, Commerce may consult the petition, the final determination in the investigation, any previous review or determination, or <u>any other information placed on the record</u>, which would include cooperating party information, like Shinkong's margin transaction data. See id. The corroboration requirement is housed in subsection (c), and provides that when Commerce "relies on <u>secondary information rather than on information obtained in the course of an investigation or review</u>, [Commerce] . . . shall, to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal." Id. § 1677e(c) (emphasis added).

Commerce makes a fairly airtight argument that Nan Ya's total AFA margin selected from Shinkong's data is not "secondary information" within the meaning of the statute because that data was obtained in the course of the instant review, and ergo, no corroboration is required. Remand Results at 4-6 & nn.2, 3. It is a straightforward Chevron step one interpretation that focuses on the plain meaning of subsection (c), one the court has approved on two prior occasions. See iScholar Inc. v. United States, 35 CIT ___, ___, Slip Op. 11-4 at 5-7 (Jan. 13, 2011); Ass'n of Am. Sch. Paper Suppliers v. United States, 32 CIT 1196, 1200-04 (2008). With corroboration inoperative, Commerce

Court No. 11-00535                                                                                         Page 9

maintains that the de Cecco standard is also inapplicable, leaving only the more general requirement that its AFA selection must be supported by substantial evidence (reasonable).

And yet, in both the Final Results and Remand Results, Commerce did not simply select Shinkong's highest transaction specific margin in setting Nan Ya's rate, and leave it at that.  Commerce went further and measured the rate's appropriateness by analyzing Nan Ya's own prior transaction-specific data.  Remand Results at 15; Nan Ya I, 37 CIT at ___, 906 F. Supp. 2d at 1352.  Despite asserting the inapplicability of de Cecco and corroboration, Commerce nevertheless followed its standard corroboration playbook to tie the selected AFA rate (chosen from another party's data) to the uncooperative respondent, Nan Ya.  Compare Remand Results at 15, with PAM, S.p.A., 582 F.3d at 1338-40 (tying "the highest margin applied to any party that had been previously upheld in the proceeding" to the uncooperative respondent using uncooperative respondent's own data from a prior administrative review), Ta Chen, 298 F.3d at 1339-40 (tying the highest rate from the investigation to the uncooperative respondent using uncooperative respondent's own data from the current administrative review), and Fujian Lianfu Forestry, 34 CIT at ___, 700 F. Supp. 2d at 1363 (tying rate originally assigned to another respondent in a contemporaneous new shipper review to uncooperative respondent using uncooperative respondent's own model-specific margins from the prior proceeding).  And when Commerce suggests that de Cecco is inapplicable, leaving the more general substantial evidence standard to review its AFA selection, the question arises: "substantial evidence of what exactly?"  Commerce provides the answer by effectively

corroborating the rate with Nan Ya's own data from the prior review. It can be viewed as an effort to justify Shinkong's highest transaction-specific margin as a reasonably accurate estimate of Nan Ya's actual rate plus some built-in increase intended as a deterrent against non-compliance. So de Cecco applies after all. And it is that familiar standard the court will apply in reviewing the reasonableness of Commerce's AFA selection, to which the court now turns.

### B. Nan Ya's AFA Rate

Commerce frequently selects AFA rates from among the highest rates assigned during any segment of the proceeding, the highest transaction- or model-specific margins available on the administrative record, or somewhat more rarely, the highest rates alleged in the petition. E.g., Certain Lined Paper Products from the People's Republic of China, 74 Fed. Reg. 63,387, 63,389-90 (Dep't of Commerce Dec. 3, 2009) (final determ. second admin. review) (highest rate from prior segment of the proceeding); Polyethylene Retail Carrier Bags From Taiwan, 75 Fed. Reg. 14,569, 14,570 (Dep't of Commerce Mar. 26, 2010) (LTFV final determ.) (highest margin alleged in the petition); Certain Tow Behind Lawn Groomers and Certain Parts Thereof from the People's Republic of China, 74 Fed. Reg. 29,167, 29,170 (Dep't of Commerce June 19, 2009) (LTFV final determ.) ("highest margin on an individual model which fell within the mainstream of [a cooperative respondent]'s transactions"); see Remand Results at 16-17.[3] Commerce also often uses

---

[3] This approach is a vestige from the old pre-URAA "Best Information Available" or total BIA cases in which Commerce presumed the highest margin "is the most probative evidence of current margins because, if it were not so, the importer, knowing the rule [that

similarly high-value data to corroborate AFA rates derived from secondary information. E.g., Wire Decking from the People's Republic of China, 75 Fed. Reg. 32,905, 32,908 (Dep't of Commerce June 10, 2010) (LTFV final determ.) (corroborating petition rate using "the highest CONNUM-specific margin from the two mandatory respondents"); Narrow Woven Ribbons with Woven Selvedge from the People's Republic of China, 78 Fed. Reg. 10,130, 10,133 (Dep't of Commerce Feb. 13, 2013) (final results admin. review) (corroborating petition rate using highest "model-specific rates calculated for the mandatory respondent" during the prior proceeding).

It is not surprising, then, that plaintiffs in total AFA cases often argue that Commerce's selected AFA rate or corroborating information is aberrational or outlying (unreasonable) when measured against other margin data from the whole administrative record (which includes whatever corroborating information Commerce or the parties add to the record). See, e.g., Gallant Ocean, 602 F.3d at 1323-25 (agreeing that adjusted petition rate was "aberrational" in light of record data used to calculate significantly lower rates for "over a dozen" cooperative respondents); Fujian Lianfu Forestry, 34 CIT at ___, 700 F. Supp. 2d at 1362-63 (arguing that model-specific margins used to corroborate were "aberrant" because they were too high and based on too small a percentage of total sales); PSC VSMPO-AVISMA, 35 CIT at ___, 755 F. Supp. 2d at 1337-38 (arguing that the "rate is impermissibly aberrational because it is based on an outlier sale" that had "an

---

Commerce would assign it to uncooperative parties], would have produced current information showing the margin to be less." Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1190 (Fed. Cir. 1990).

Court No. 11-00535 Page 12

unusually low quantity, unusually high freight expenses"); Universal Polybag Co. v. United States, 32 CIT 904, 918-19 & n.12, 577 F. Supp. 2d 1284, 1298 & n.12 (2008) (arguing that transaction-specific margins used to corroborate AFA rate were aberrational with respect to percentage rate and product type).

Nan Ya is no different than the typical AFA plaintiff, arguing that Shinkong's transaction underlying the 74.34% rate is aberrational because it is based on too small a percentage of Shinkong's total sales, and involves a model with atypical features that Shinkong sold infrequently during the POR. Pl.'s 56.2 Br. at 6-8; Pl.'s Br. at 12-14. Although these arguments have some merit, they do not render Commerce's use of that transaction unreasonable because other competing record information suggests that the transaction was not aberrational. The transaction involved a larger quantity than many of Shinkong's other sales, and differed from other models in "the least important physical characteristics." Remand Results at 14. More important, as Commerce noted, "[i]n the underlying review, Shinkong, the party that knows best which of its products are unusual," and the party with the greatest incentive to minimize the impact of its own high-margin data, "did not argue that the transaction resulting in the margin should be excluded for any reason." Id. at 16. A reasonable mind would therefore not have to conclude that Shinkong's highest margin transaction was aberrational. Stated another way, the administrative record does not mandate a finding that Shinkong's highest margin transaction was aberrational.

Beyond the more typical arguments challenging an AFA proxy, Nan Ya also presents a formal statistical analysis to demonstrate that the AFA rate was an outlier and

Court No. 11-00535                                                                                         Page 13

therefore unreasonable. Nan Ya applies three "commonly accepted statistical test[s]" to Shinkong's data: (1) a "gap test", (2) an interquartile range methodology used by the Internal Revenue Service, and (3) a standard deviation analysis. Pl.'s 56.2 Br. at 8-13; Pl.'s Br. at 7-9; Nan Ya I, 37 CIT at ___, 906 F. Supp. 2d at 1352-54.

Just as a quick aside, applying statistical tests to Commerce's selection of the "highest" rate as an AFA proxy makes good practical sense if a respondent ultimately plans to challenge whether that "extreme value"[4] is a reasonable choice given the "central tendency"[5] of other data on the administrative record. At the very least, it would seem to identify the probable commercial realities of an uncooperative respondent more concretely than the guesswork occasioned by an undeveloped record with comparatively superficial assertions about outliers and aberrancy.

Unfortunately, Nan Ya did not apply its statistical analysis to the full data set upon which Commerce relied. When selecting the 74.34% rate, Commerce relied on Shinkong's transaction-specific margins, as well as Nan Ya's own transaction-specific margins from the prior administrative review (finding multiple Nan Ya transactions above the 74.34% rate). Decision Memorandum at 15; AFA Assignment Memorandum at 3. The reasonableness of the 74.34% rate therefore depends on both Shinkong's and Nan Ya's data. It is that combined data set against which Nan Ya needed to apply its statistical

---

[4] W. Paul Vogt, Dictionary of Statistics & Methodology 115 (3d ed. 2005) (defining "extreme values" as "[t]he largest and smallest values in a distribution of values").

[5] Id. at 41 (defining "central tendency" as "[a] point in a distribution of [values] that corresponds to a typical, representative or middle [value] in that distribution—such as the []mode, []mean, and []median").

analysis. Nan Ya, though, has treated Shinkong's data as a closed set (as if it were the only data supporting Commerce's decision), and has ignored its own data. Nan Ya therefore leaves unchallenged Commerce's corroborative justification for the reasonableness of the 74.34% rate: "<u>Nan Ya</u> was capable of dumping at" 74.34% as evidenced by <u>Nan Ya's</u> own data. <u>Decision Memorandum</u> at 15 (emphasis added).

　　Nan Ya does not offer much of an explanation as to why it failed to incorporate its own prior data into its statistical analysis.[6] Nan Ya instead tries to minimize the significance of that data through two arguments, neither of which the court finds persuasive. First, Nan Ya argues that when Commerce summarized Nan Ya's argument in the <u>Final Results</u> "without objection" (Nan Ya's words), Commerce ostensibly "admitted" that Nan Ya's two 99.31% transaction-specific margins are aberrational. Pl.'s Br. at 15-16. Commerce, though, made no such admission, but simply explained that Nan Ya's arguments about the preliminary rate "no longer need[ed] to be addressed" because Commerce chose a different rate. <u>Decision Memorandum</u> at 7. More important, in the <u>Final Results</u> and <u>Remand Results</u>, Commerce relied on more than those two transactions to tie the 74.34% rate to Nan Ya, and Nan Ya simply never addresses this additional data. Second, Nan Ya argues that Commerce was required to corroborate the corroborating data; that is, corroborate Nan Ya's transactional data from the prior review. <u>See</u> Pl.'s Br. at 14-15. Not much need be said here other than that corroboration need not go on <u>ad infinitum</u>. The statute authorizes Commerce to corroborate Shinkong's

---

[6] For whatever reason, Nan Ya also chose not to access and analyze Nan Ya's more than 10 years' worth of prior margin data that Commerce did not use for corroboration.

transaction-specific margin with information "from independent sources that are reasonably at [its] disposal," 19 U.S.C. § 1677e(c), which certainly includes Nan Ya's own prior transactional data.  See PAM, S.p.A., 582 F.3d at 1340; Fujian Lianfu Forestry, 34 CIT at ___, 700 F. Supp. 2d at 1363.  The burden was not on Commerce to corroborate the corroborating data, but instead on Nan Ya to (1) analyze its own prior transactional data, (2) provide a compelling narrative of its "commercial reality", and (3) propose an alternative total AFA proxy, all with the aim of demonstrating the unreasonableness of the total AFA rate of 74.36%.

It is Nan Ya that ultimately bears the burden to demonstrate that Commerce's AFA selection is unreasonable.  See 28 U.S.C. § 2639(a)(1) ("[T]he decision of . . . the administering authority . . . is presumed to be correct.  The burden of proving otherwise shall rest upon the party challenging such decision.").  By failing to address its own data that provided the corroborative support for Commerce's assignment of the 74.34% total AFA proxy, Nan Ya has failed to meet that burden.  Viewed alongside Shinkong's data, Nan Ya's numerous transaction-specific margins appear to show that the 74.37% rate may well be a reasonably accurate estimate of Nan Ya's actual rate plus some built-in increase intended as a deterrent against non-compliance.  Accordingly, the court must sustain Commerce's AFA selection.  See Hubscher Ribbon Corp. v. United States, 38 CIT ___, ___, 979 F. Supp. 2d 1360, 1366-71 (2014) ("[Plaintiff] . . . passed up an important opportunity to crunch [the cooperative respondent's] data against its own data and create a narrative of its own commercial experience to discredit [the AFA rate]. . . .

[Plaintiff] has left too much unexplained and has not met its burden to demonstrate the unreasonableness of Commerce's corroboration.").

With that said, although Nan Ya's statistical arguments are not persuasive here,[7] such statistical methodologies could very well support or enhance an analysis of the reasonableness of Commerce's total AFA selection under the de Cecco standard. Commonly-accepted interquartile range methodologies might be useful in describing outliers in non-normally distributed data sets, as they are in other contexts. See, e.g., Jared A. Wilkerson, Defending the Current State of Section 363 Sales, 86 Am. Bankr. L.J. 591, 618 n.132 (2012); John F. Pfaff, The Durability of Prison Populations, 2010 U. Chi. Legal F. 73, 77 (2010); Lee Epstein, Andrew D. Martin & Christina L. Boyd, On the Effective Communication of the Results of Empirical Studies, Part II, 60 Vand. L. Rev. 801, 815 n.38 (2007). A "gap test" might also be helpful as Commerce itself employed a "gap test" of sorts when evaluating its own potential choices for the preliminary results, settling upon Nan Ya's 99.31% rate after rejecting several higher transaction-specific

---

[7] Even overlooking the problematical data omission, Nan Ya failed to demonstrate the unreasonableness of the 74.34% rate using Shinkong's data alone. Under the "gap test" analysis, the gaps between Shinkong's highest transaction-specific margins do appear small enough to be "consistent with" Commerce's conclusion that Shinkong's "margins steadily increase by small amounts over the course of [all its] transactions." Remand Results at 18; see id. at 27 (explaining that, by comparison, Nan Ya's highest transaction-specific margins were not suitable preliminary choices for an AFA rate because they "suddenly jumped" significantly, with similar gaps absent in Shinkong's data). Also, the IRS interquartile methodology does not help identify a suitable alternative AFA proxy (at least when applied to Shinkong's data alone), because it yields AFA proxy choices lower than Nan Ya's prior 18.30% calculated rate. See id. at 19. Finally, as Commerce reasonably explains, Shinkong's transaction-specific margin data does not appear to lend itself to a proper standard deviation analysis. See id. at 19-20.

margins because they "suddenly jumped" higher than the two 99.31% transactions.  See Remand Results at 27.  It may be, however, that incorporating statistical tests to challenge an AFA rate is easier said than done; otherwise one might have anticipated a more prevalent role in the many AFA cases since the de Cecco standard emerged nearly 15 years ago.

In any event, for the reasons set forth above, the court sustains Commerce's assignment of a total AFA rate of 74.34% for Nan Ya. Judgment will be entered accordingly.

/s/ Leo M. Gordon
Judge Leo M. Gordon

Dated: August 14, 2014
New York, New York